# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeals of -- )
)
Truckla Services, Inc. ) ASBCA Nos. 57564, 57752
)
Under Contract No. W912EE-09-C-0030 )

APPEARANCE FOR THE APPELLANT: Kent B. Ryan, Esq.
The Miller Law Firm PLLC
New Orleans, LA

APPEARANCES FOR THE GOVERNMENT: Thomas H. Gourlay, Jr., Esq.
Engineer Chief Trial Attorney
Daniel L. Egger, Esq.
Engineer Trial Attorney
U.S. Army Engineer District, Vicksburg

## OPINION BY ADMINISTRATIVE JUDGE NEWSOM

These appeals concern a default termination and related claim on a contract to build stone dikes on and near the Mississippi River. The Army Corps of Engineers (Corps or government) awarded the contract to appellant Truckla Services, Inc. (Truckla or appellant) but terminated for default after Truckla did not finish within the contract performance period. Truckla challenges the termination on various grounds including that its delays were excusable, alleging that delays were due in part to the British Petroleum oil spill in the Gulf of Mexico. Truckla also seeks payment for work it contends it performed but for which it was not paid.

After a four-day hearing and submission of post-hearing briefs and replies, we deny the appeals.

## FINDINGS OF FACT

### Contract Award and Contract Terms

1. On 31 August 2009, after a competitive procurement, the Corps awarded Contract No. W912EE-09-C-0030 to Truckla to construct 15 stone structures called "hardpoints" in a waterway off the Mississippi River near a location called Island 86, then, after completing the hardpoints, to rebuild and extend 2 pre-existing stone dikes on the Mississippi River at a location called the Lower Cracraft (R4, tab 3 at 189-91).[1]

---

[1] Page references in Rule 4, tab 3 are to consecutive numbers on the top, left-hand side of each page.

2. A hardpoint is a short dike made of rocks formed in a row extending from the bank into the water (ex. J-2 (photographs)). The purpose of the hardpoints was to stabilize the bank by redirecting water in order to keep the channel from "widening and increasing in flow" (tr. 3/86).

3. The government was to pay Truckla for each of three contract line item numbers (CLINs). CLIN 0001 required mobilization and demobilization, for which Truckla was to be paid $100,000. CLIN 0002AA required placement of the first 36,145 tons of stone at a unit price of $26.28. CLIN 0002AB required placement of stone in amounts exceeding 36,145 tons at the same fixed unit price. If all CLINs had been performed in full for the exact quantities set forth in the CLINs, the total contract payment would have been $1,999,781.20 for an estimated quantity of 68,290 tons of placed stone. (R4, tab 3 at 3, 193-94)

4. The contract provided that Truckla was to be paid "for stone satisfactorily placed" (R4, tab 3 at 194). To determine if stone was "satisfactorily placed," the contract established quality standards. Section 35 42 39.00 09, part 3, subsection 3.1, Stone Placement, required that "[t]he dikes and stone hardpoints shall be constructed to the elevations, cross sections, and minimum thicknesses and within the limits shown on the contract drawings" (*id.* at 251). Contract drawings identified each hardpoint's required elevation, azimuth[2] and distance from neighboring hardpoints (ex. J-3, drawings C-103, C-104). They also specified the amount of stone to be used and the average length of a hardpoint (*id.*, drawing D-501).

5. The contract also specified the angle of slide slopes and permissible tolerances, stating:

> Side slopes shall be determined by the angle of repose of the
> stone, approximately 1V on 1.25H.... A tolerance of 1 foot
> will be allowed above the specified elevation and no
> tolerance below the specified elevation, and 1 foot under and
> 2 feet over the specified crown width, provided these
> variations are gradual over a minimum distance of 100 feet
> measured along the centerline.

(R4, tab 3 at 251)

---

[2] In this context, azimuth was the angle of the hardpoint in relation to north (tr. 4/28 (Pinkard)).

6. Certain work was not separately priced; compensation for these items was included in payment for stone placement, as noted in section 1.2.1 of the contract, which provided that:

> The lump sum price and payment made for each item listed shall constitute full compensation for furnishing all plant, labor, materials, and equipment, and performing any associated Contractor quality control, submittal procedures, environmental protection, meeting safety requirements, tests and reports, providing as-built drawings, for using the Government-furnished software (RMS) and providing all labor and equipment necessary for electronic exchange of information and management of the contract...and for performing all work required for which separate payment is not otherwise provided.

(R4, tab 3 at 193)

7. One example of required work that was not separately priced was construction surveys of placed stone. Regarding surveys, the contract provided that "[s]eparate payment will not be made for these surveys and all costs associated therewith shall be included in the applicable unit prices or lump sum prices contained in the Bidding Schedule" (R4, tab 3 at 174).

8. The contract called for monthly progress payments based on estimates of work meeting the standards of quality established under the contract, incorporating Federal Acquisition Regulation (FAR) 52.232-5, PAYMENTS UNDER FIXED-PRICE CONSTRUCTION CONTRACTS (SEP 2002) (R4, tab 3 at 72-74).

9. The contract required Truckla to complete the work within 60 calendar days after its receipt of the notice to proceed (R4, tab 3 at 1). The performance period could be extended for certain excusable reasons, all of which are relevant here. First, the contract contemplated that high river conditions could interrupt work, and if the river rose above certain stages, construction would not be permitted and the government would grant time extensions. (*Id.* at 189-90) The contract explained that the "normal working season for the work to be done under this contract is seldom more than five months, and usually extends from about 15 July to 15 December" (*id.* at 151-52).

10. Second, the contract prohibited work from 19 December 2009 through 3 January 2010 which the government referred to as "holiday time" (tr. 1/182) and from 1 April through 30 June of each year for the pallid sturgeon spawning season (R4, tab 3 at 150).

3

11. Third, the contract incorporated the default clause at FAR 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984). This clause allowed termination for default for failure to prosecute the work or failure to complete the work within the time allowed by the contract, provided that the contractor's right to proceed shall not be terminated for delay that "arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor." (R4, tab 3 at 120-22)

Truckla Begins to Build the Hardpoints in December 2009

12. The government issued a notice to proceed on 13 October 2009, and thus the original contract completion date was 12 December 2009 (R4, tab 5). By Modification No. A00001 dated 29 January 2010, the government extended the performance period by 48 days due to high river stages. Accordingly, the required completion date was extended to 14 February 2010. Modification No. A00001 also acknowledged that Truckla worked on the hardpoints from 1 to 17 December 2009 (R4, tab 3A at 2, 4-5).

13. Hardpoints are built by depositing stone into water at predetermined locations, building them into rows (R4, tab 3 at 191). Truckla used two barges to place the stone. One barge, known as a "spud barge," held a trackhoe. A spud barge has one or more extendable legs called "spuds" which are plunged into the river bottom to secure the barge in place. A second barge, called the "rock barge," held the stone. Truckla positioned the two barges on either side of the location at which the hardpoint was to be built. Using the trackhoe on the spud barge, Truckla grabbed stone, dragged, and dropped it into the water along and between the barges, building the stone into rows. (Tr. 1/57-58, 2/128-31; ex. J-9)

14. Truckla did a poor job of maintaining correct positioning of its barges, which tended to drift together at one end. This caused Truckla to lay stone in zigzag fashion, not straight. (Ex. J-9, photo 1; tr. 3/244-46) Truckla also had trouble laying stone at a consistent rate of 10 tons per linear foot, as the contract drawings required, resulting in inconsistencies (exs. J-2 (photographs), J-4 (drawing C-301), J-18, e.g. HP-6, 7, 8, 9, 10, 11, 28, 30; tr. 1/56, 3/241).

15. Stone placed under water may not be visible, so the contract required Truckla to plot as-built survey profiles and cross-sections and provide them to the government on a daily basis to verify the position of the stone. Truckla was also required to provide additional profiles and cross-sections "as necessary or as directed by the onsite Government Representative." (R4, tab 3 at 174)

16. Concerned about the quality of the stone placement, government representatives repeatedly requested Truckla to supply as-built survey data to verify that the stone was placed correctly (R4, tab 18 at 60, 63, 70, 73, 77). To the extent Truckla supplied surveys, those data did not show the location, azimuth, or cross-sections of the hardpoints (exs. J-8, J-10; tr. 3/246-50).

4

17. On 18 December 2009, Truckla ceased construction because of high river conditions, which was followed by the contractual holiday time exclusion period starting 19 December 2009. Truckla did no further work during 2009. (R4, tab 3A at 5) Indeed as things turned out, Truckla performed no further construction at all (finding 35).

18. As of 17 December 2009, its last day before the exclusion period, Truckla had built all 15 hardpoints except that it had not "tied them in" (tr. 2/264-65). To "tie in" means to extend the stone from the hardpoints onto the bank (tr. 3/139).

Deficiencies in the Hardpoints

19. The Corps met with Truckla on 19 January 2010 to discuss concerns about the work (supp. R4, tab 6; R4, tab 6; tr. 2/194-97). Among other things, the government complained that the hardpoints were located in the wrong positions and shaped to incorrect dimensions, and that Truckla did not provide surveys showing their locations, cross-sections, and other dimensions (R4, tabs 7, 8). Truckla agreed to hire a subcontractor to perform as-built surveys and provide them to the government (supp. R4, tab 6).

20. The surveys confirmed that hardpoints did not meet the contract requirements. They were built in the wrong locations and laid along the wrong azimuths, they zig-zagged and were angled incorrectly. Because Truckla laid stone at inconsistent rates, it placed too much stone in some spots and not enough in others, resulting in inconsistencies in elevation, voids, and gaps. (Exs. J-2 (photographs), J-18, e.g. HP-6, 7, 8, 9, 10, 11, 28, 30; tr. 3/241, 1/56) We find that the stone was not "satisfactorily placed" pursuant to section 1.3.2 of the contract.

21. On 24-25 March 2010 the government notified Truckla that "none of the hardpoints...meet the contract requirements," and that they "var[ied] in elevation, azimuth, and section beyond the required tolerances," and the azimuth lines were "not straight" but "change direction in a zigzag fashion" (R4, tabs 6, 7). It summarized: "the work performed to date is much more deficient than we previously realized and that considerable rework will be required to bring the work into compliance with the contract" (R4, tab 6).

22. Nevertheless, the government said it would accept the mislocation of the hardpoints *provided that* Truckla corrected other deficiencies and tied them into the bank (R4, tab 7). The government characterized its provisional acceptance as an effort to mitigate Truckla's cost of corrective work (R4, tab 8). The government also criticized the "general lack of knowledge and experience by [Truckla's] onsite personnel in stone placement on a river utilizing floating plant." Noting that the Cracraft environment was more challenging than Island 86 and the importance of correct alignment even more critical for the dikes than for the hardpoints, the government

5

directed Truckla to explain how it would improve operations to assure that it could satisfactorily perform. (*Id.*)

23. Citing these deficiencies, the government refused to pay in full Truckla's invoice for a progress payment. In December 2009 Truckla had submitted an invoice seeking $582,102.00 for 22,150 tons of laid stone (supp. R4, tab 15). In February 2010 the government notified Truckla that the government would pay for only 9,465 tons of stone, the quantity it said was minimally acceptable with only minor corrections required. The government paid $248,740.20 for the stone plus $60,000 for mobilization; it refused to pay more until Truckla corrected the hardpoints. (R4, tab 2 at 12, tab 10; supp. R4, tab 2 at 9-10, tab 17) It also refused to pay Truckla for the cost of the surveys, stating that compensation for surveys was included in the contract price and no additional compensation was due (tr. 2/198-99; R4, tab 10). The 9,465 tons of stone accepted by the government comprised approximately 13 percent of the 68,290 tons in the contract (finding 3).

24. In its 9 April 2010 response, Truckla did not dispute that the hardpoints were deficient, but promised to correct the deficiencies and replace some of its personnel (supp. R4, tab 7). Indeed, even at trial, Truckla's owner conceded that the hardpoints did not conform to the contract requirements, acknowledging that they were mislocated and misaligned (ex. J-18; tr. 2/261-64).

Lack of Progress During 2010

25. Meanwhile, work remained at a standstill. High river conditions prevailed during most of January, February, and March 2010, except for 9 days in January and 7 days in March. Truckla performed no work on the hardpoints during these periods apart from hiring a subcontractor to perform surveys in January 2010. (Supp. R4, tab 17 at 6; R4, tab 2 at 30, tab 3B at 3, 5) Truckla demobilized in February 2010, having decided to await a period when "better working conditions are favorable for an extended amount of time" (supp. R4, tab 17 at 6; R4, tab 3B at 3, 5).

26. From 1 April to 30 June 2010 the contract excluded work because of pallid sturgeon spawning season (R4, tab 3 at 150).

27. During the standstill, Truckla searched for a subcontractor to complete the remaining work (tr. 2/206-07). In March and April 2010 Truckla negotiated with Patton-Tully Marine, LLC (PTM) and exchanged draft subcontracts (exs. T-60, -63, -64; tr. 2/207, 218). At one point, attorneys for PTM and the Corps spoke directly (ex. T-70). PTM's availability, however, was limited. During 2010 it was only available in August. As it turned out, the river remained too high to work throughout the 2010 period that PTM said it was available. (R4, tabs 3C, 11, 12)

6

28. Complicating matters, on 20 April 2010, a British Petroleum (BP) oil platform explosion occurred causing a massive oil spill in the Gulf of Mexico (tr. 2/219). The BP oil spill created demand for spud barges to support oil cleanup (tr. 2/219-20, 3/50-54). Meanwhile, on 7 May 2010, the government extended the contract by 70 days via Modification No. A00002; thus establishing a new completion date of 25 July 2010 (R4, tab 3B). During summer 2010, Truckla encountered difficulties finding spud barges to lease, even after contacting several equipment suppliers (tr. 2/218-24; exs. J-13, -14). In the past, Truckla had been able to rent a spud barge on short notice (tr. 2/169-70).

29. In June 2010 Truckla notified the government that it found another subcontractor, Upper Missouri River Corporation, to perform the remaining work (supp. R4, tabs 9, 10; ex. T-70). Ultimately, Upper Missouri declined to commit because it could not be assured of rock deliveries from Truckla's rock supplier (exs. J-13, -14; R4, tab 15 at 6). Truckla owed more than $400,000 to its rock supplier, which threatened a collection action and refused to supply either rocks or barges to Truckla, stating that "barges and stone were no longer available for this contract" (R4, tab 15 at 6; supp. R4, tab 18 at 2). Truckla requested another progress payment, but the government again refused until Truckla corrected the hardpoints (supp. R4, tabs 18, 19; R4, tab 10; ex. J-16 at 26).

30. Apart from its own correspondence complaining about the government's partial progress payment, Truckla presented no evidence of its 2010 financial condition nor explanation why it did not pay the rock supplier (supp. R4, tabs 18, 19; R4, tab 10; ex. J-16 at 26).

River Stages Allow Work, But Truckla Fails to Return

31. By 2 September 2010 river conditions were favorable and on 15 September 2010 the government informed Truckla that the contract performance period would restart on 20 September 2010 (R4, tab 11). Truckla responded on 16 September 2010 that it could not resume work because it was having difficulty lining up equipment and subcontractors and that the spud barges it previously leased were unavailable because of the BP oil spill (ex. J-14).

32. On 17 September 2010, the government reiterated that the performance period would restart on 20 September, stated that the contract completion date was 14 October 2010, and directed Truckla to submit a plan and schedule (R4, tab 12). In calculating the revised contract completion date, the government credited Truckla for 199 days of time extensions due to high river conditions (R4, tabs 3A, 3B, 3C). These time extensions, combined with the contractual work exclusion periods (19 December 2009 through 3 January 2010 and 1 April 2010 through 30 June of 2010) pushed the contract completion date to 14 October 2010 (R4, tabs 3C, 12).

33. Truckla did not return to the job, and in its 22 September 2010 response, did not provide a plan or schedule as the contracting officer requested. Rather, it asserted that it was unable to locate equipment to resume work due to the "BP situation." It said it had a "willing subcontractor" and requested to meet with the contracting officer and small business representative. Later, Truckla provided to the government a copy of Truckla's unsigned, marked-up April 2010 draft subcontract with PTM as evidence of PTM's willingness to perform. (R4, tabs 13, 14)

34. Meanwhile, PTM spoke directly to the contracting officer and at the contracting officer's request, provided a letter stating that PTM's availability for the project "could range from the Winter 2011 to the Summer 2011 subject to our work backlog and river stages." Significantly, PTM also stated it "does not have an agreement with Truckla Services for this work." (Tr. 2/42; ex. J-15; ex. T-59)

35. The 14 October 2010 completion date passed without Truckla returning to the job (R4, tabs 13, 14). As of that date, the status of the work had not changed since December 2009: 15 hardpoints at Island 86 had been constructed but not tied in to the bank; the hardpoints did not comply with the contract requirements as to location, azimuth, cross-section, or elevation; and many hardpoints zig-zagged and had voids and gaps, and no corrections had been made (finding 20). No work had been performed on the Lower Cracraft dikes (R4, tab 2 at 16). We find that Truckla did not complete the work within the performance period as extended.

Truckla Defaults and the Government Terminates

36. The passing of the contract completion date led the government to issue a 10-day cure notice on 4 November 2010. The contracting officer asserted that Truckla failed to provide a plan for completion of the work, had not diligently prosecuted the work, and was endangering performance of the contract. She directed Truckla to submit a plan for cure, including a realistic schedule by close of business 12 November 2010. (R4, tab 14)

37. In its response on 12 November 2010, Truckla proposed to subcontract with PTM, who, Truckla now said, could complete the project in August 2011. Truckla blamed contract delays on the BP oil spill and blamed the government for the mislocation of the hardpoints. (R4, tab 15)

38. By separate letter dated 12 November 2010, PTM stated that it would be available to work either late July or August 2011 or "as soon as river stages are workable after these dates." PTM reiterated that it had not reached agreement with Truckla on pricing, work scope, or other terms, explaining:

> Before Patton-Tully Marine, LLC would comment
> [sic] to this work an agreement with Truckla Services must

be agreed to by both parties. This agreement to include as a
minimum the work agreed to by Patton-Tully Marine, LLC,
pricing for the work and payment guarantee. Patton-Tully
Marine, LLC would accept no liability for work performed
by others. All Terms in the agreement must be to
Patton-Tully Marine, LLC approval.

(Ex. J-1)

39. The government issued a show cause notice on 18 November 2010
threatening to terminate for default (R4, tab 16). Truckla responded on 29 November
2010 reiterating its previous positions (R4, tab 17).

40. The contracting officer terminated Truckla's right to proceed on 14 December
2010 (R4, tab 2).

The Surety Completes the Contract with PTM as Subcontractor

41. Pursuant to Truckla's performance bond, the government made a demand on
Truckla's surety, Travelers Casualty and Surety Company of America (Travelers), to
complete the contract. Travelers executed a Takeover Agreement with the government
on 22 June 2011 pursuant to which Travelers agreed to complete performance of the
contract (ex. J-5).

42. The Takeover Agreement provided, among other things:

[T]he Government and Surety agree that the quantity of
stone currently in place on Island 86 hardpoints that can be
considered acceptable for payment purposes once the
Government's required remediation work is complete is
16,791 tons. Of this quantity, payment for 9,465 tons was
previously made to the Contractor prior to
termination...[T]he Government and Surety agree that an
additional 5,061 tons of stone are required for the
Government's required remediation work to the Island 86
hardpoints. Upon completion of the Government's required
remediation work...the Government shall issue payment to
the Surety for the 7,326 tons placed by Contractor prior to
termination and the 5,061 tons required for the government's
required remediation for a total payment for 12,387 tons....

With regard to the Lower Cracraft dikes, the agreement indicated that a balance of
50,438 tons (not to exceed 72,290 tons) needed to be placed in order to complete that
portion of the contract. (Ex. J-5 at 3; ex. T-2 at 2)

9

43. Travelers hired PTM to perform the completion work (ex. J-5 at 2). The record demonstrates that Travelers requested that the Corps identify potential contractors, and the Corps provided the names of all contractors that had done river work with the Vicksburg District, a list of contractors holding certain multiple award contracts, and a list of contractors that had bid on the present contract (tr. 1/242). We find no evidence that the government recommended or directed travelers to use PTM to complete the contract.

44. PTM completed the contract in August 2011. It did not lay additional stone to remediate the hardpoints. (Tr. 1/92-95; ex. T-1 (Daily Logs, 4-7 Aug. 2011)) To correct the alignment and elevations of the hardpoints, PTM rearranged mislaid stone and placed it into voids or gaps (tr. 1/56-59). It was unable to locate all the mislaid stone (tr. 1/59), nor could it quantify the rock PTM moved to remediate the hardpoints (tr. 1/138).

45. Even after the remedial work, the hardpoints remained in the wrong locations and along incorrect azimuths. As one government quality assurance representative testified, "[t]o get [the hardpoints] within the requirements of the contract on the correct structural azimuth line, most of them would have had to have been entirely removed. And that's almost impossible." (Tr. 1/129-30) He continued, "We did everything we could to try to make them at least acceptable, even though they were still in the wrong place, totally" (tr. 1/138).

Basis for the Termination Decision and Truckla's Excuses for Nonperformance

46. In her written decision dated 14 December 2010, the contracting officer justified the termination on the ground that Truckla failed to complete the contract on time and did not propose a realistic, acceptable plan for cure. She found that Truckla had completed only 13 percent of the work and the remaining 87 percent had either not been performed (none on the Lower Cracraft dikes), or was improperly performed (Island 86 hardpoints). (R4, tab 2 at 13-26) She reviewed the contract terms and considered, but rejected, Truckla's assertion that the BP oil spill caused the delay, noting that other Corps contractors successfully located spud barges (id. at 1-7, 17-23). She rejected Truckla's assertions that the government caused delay or caused Truckla to mislocate the hardpoints (id. at 13-26; tr. 1/198-200, 208-11).

47. Truckla timely appealed the termination decision on 11 March 2011. This appeal was docketed as ASBCA No. 57564 (R4, tab 1).

48. At the hearing, the contracting officer elaborated that Truckla's proposal to subcontract to PTM was too uncertain to be accepted and that Truckla did not provide "verifiable assurances" that it could complete the contract (tr. 1/198-200, 208-11). She testified that she had not heard of any other contractors requesting extensions because of equipment supply problems and that "multiple contractors" were available to perform

10

the work (tr. 1/218-19). While the job was not urgent, she said it must be completed "sooner rather than later" to prevent erosion and "more damage happening," especially because finding a replacement contractor could take time (tr. 1/220, 222-24, 226). She testified that she considered the essentiality of Truckla as a supplier under other contracts and its ability to liquidate loans and payments (tr. 1/226-27). We find, based on the record, that her actions were reasonable.

## Were the Hardpoints Serving Their Purpose?

49. In challenging the default termination, Truckla argues that the hardpoints served their intended purpose of preventing bank erosion, citing its expert, Mr. Hannoura, who testified that no erosion appeared in photographs taken in January 2011 (tr. 3/175-201; ex. J-2; app. br. at 18).

50. The government's expert, Freddie Pinkard, however, testified that erosion develops over time, sometimes years (tr. 4/15). Mr. Pinkard credibly explained that gaps and voids in the hardpoints–such as those left by Truckla's operation (findings 14, 20)–expose the bank to increased risk of erosion:

> As I had mentioned before when that flow goes around that structure or through those gaps it accelerates. So in the long term you have the potential for that erosion to occur. When that erosion occurs it's going to scour the bed of the channel, it's going to create a hole. And when that hole is created the stone that's adjacent to it is going to fall in that hole. So you will reduce the volume of stone that you actually have in that structure.

(Tr. 4/15) Mr. Pinkard's testimony persuades us that photos taken in January 2011 – approximately one year after Truckla stopped work – are insufficient to establish that the hardpoints were preventing bank erosion or would continue to do so.

51. Truckla also cited testimony of a government employee who relied upon flyover pictures taken in 2012 to conclude that the hardpoints were – at that time – serving their purpose (tr. 3/88, 96-97; ex. J-17). Those photographs were taken after PTM finished remedial work in August 2011 (findings 44-45), and thus do not reflect the performance of the hardpoints as Truckla built them. Thus we find that these photographs do not establish that the hardpoints as built by Truckla were serving their intended purpose.

## Did the Government Cause Truckla to Build the Hardpoints in the Wrong Locations?

52. The contract required the government to establish control points, *i.e.* "base lines and bench marks," at each work site, to include "two iron pins with

11

elevations for vertical as well as horizontal control at each location." The contract locations were Island 86, Dike 2-R and Dike 3-R. Then, "[f]rom the base lines and bench marks established by the Government," Truckla was required to "complete the layout of the work and...be responsible for all measurements that may be required for the execution of the work to the location and limit marks prescribed in the specifications or on the contract drawings. (R4, tab 3 at 93, 176, 190) The contract incorporated FAR 52.236-17, LAYOUT OF WORK (APR 1984), which provides that "[t]he Contractor shall lay out its work from Government-established base lines and bench marks indicated on the drawings, and shall be responsible for all measurements in connection with the layout."

53. The Corps provided more than two control points at Island 86, as evidenced by the testimony that two government employees located at least six control points at Island 86 after Truckla left the site (tr. 1/41-47). Truckla's employee admitted that he did not search for the government's control points at Island 86 (tr. 2/151-52). Accordingly we find that the government provided more than two control points at Island 86, but Truckla did not locate them because it did not search for them.

54. Truckla asserts that the government quality representative advised Truckla to establish hardpoint locations using a global positioning system (GPS) (app. br. at 8). The testimony it cited does not support this assertion. The testimony established that one Corps employee relayed a comment from another Corps employee that Truckla "might not never find" the control points for the Cracraft dikes, but no mention was made of using a GPS. (Tr. 2/139) We find that the government did not direct Truckla to locate control points with a GPS device.

55. On 31 May 2011, Truckla submitted a certified claim seeking payment in the amount of $407,487.35 for three items: (1) $349,944.48 for stone laid to build the hardpoints for which Truckla was not previously paid; (2) $26,872 for performance bond costs; and (3) $30,670.87 for surveys performed in January 2010. Truckla contends that it placed 22,781 tons of stone on the hardpoints, and was only paid for 9,465 tons of stone, thus it claims it was not paid for 13,316 tons of stone. (Supp. R4, tab 4)

56. Truckla also sought damages in an amount to be determined for reputational harm and loss of future business and sought to convert the default termination into a termination for convenience (supp. R4, tabs 3, 4).

57. The contracting officer denied the claim for payment by written decision dated 22 July 2011 (supp. R4, tab 2). She concluded that Truckla had placed only 9,465 tons of stone in a manner that could be made acceptable with corrections that Truckla never performed (*id.* at 12).

58. Truckla timely appealed the contracting officer's denial of its monetary claim on 25 August 2011 (supp. R4, tab 1). This appeal was docketed as ASBCA No. 57752.

DECISION

We address first the termination for default in ASBCA No. 57564, then Truckla's claim for payment in ASBCA No. 57752.

I.    ASBCA No. 57564:  The Termination for Default

The legal standards for a default termination are well established.  Under the default clause, in this case FAR 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984), the government may terminate a contract for default when the contractor, without excuse, fails diligently to prosecute the work or fails to complete the work within the time prescribed by the contract.  The government bears the burden to prove that its termination was justified.  *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed. Cir. 1987); *New Era Contract Sales, Inc.*, ASBCA No. 56661 *et al.*, 11-1 BCA ¶ 34,738 at 171,022.  If the government establishes a *prima facie* case justifying the termination, the burden shifts to the contractor to prove the default was excusable.  *ADT Constr. Grp., Inc.*, ASBCA No. 55358, 13 BCA ¶ 35,307 at 173,312 (citing *Empire Energy Management Systems, Inc.*, ASBCA No. 46741, 03-1 BCA ¶ 32,079 at 158,553).

In this appeal, the government carried its burden to establish a *prima facie* basis for the default termination:  Truckla failed to complete the work within the contract period of performance (finding 35).  Failure to complete the contract work is a *prima facie* basis for a default termination.  *See, e.g., Lean Construction and Engineering Co.*, ASBCA No. 59016, 16-1 BCA ¶ 36,375 at 177,334 (holding that failure to complete work within the performance period establishes *prima facie* case that termination for default was proper).  The burden thus shifts to Truckla to prove its default was excusable.

Truckla offers three independent reasons for excusing its nonperformance.  First, it contends that the contract was wrongfully terminated because the contracting officer's decision was arbitrary, capricious, or an abuse of discretion (app. br. at 18-31).  Second, it contends that the corps should have granted an excusable delay as a result of the BP oil spill *(id.* at 31-38).  Third, it contends that its performance was excused because the government materially breached the contract, by failing to establish "iron pin" benchmarks that were to be used to determine the proper location and azimuth of the hardpoints *(id.* at 38-39).

For the reasons explained below, Truckla has not carried its burden of proof.  We deny the appeal and sustain the default termination.

A.    The Government Did Not Abuse its Discretion

Truckla contends that the default termination was arbitrary, capricious, or an abuse of discretion (app. br. at 18-31).  The standard of proof to show abuse of

13

discretion is very high. *Empire Energy*, 03-1 BCA ¶ 32,079 at 158,553. To determine whether a termination was an abuse of discretion, the Board considers (1) whether the contracting officer acted with subjective bad faith; (2) whether the contracting officer had a reasonable, contract-related basis supporting the decision; (3) the amount of discretion vested in the contracting officer; and (4) whether a proven violation of relevant statutes or regulations can render a decision arbitrary and capricious. *McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1326 (Fed. Cir. 1999); *Empire Energy*, 03-1 BCA ¶ 32,079 at 158,553.

Truckla raises no issues concerning the third and fourth factors. The contracting officer possesses broad discretion to decide whether to terminate for default, *ADT Constr.*, 13 BCA ¶ 35,307 at 173,312, and the contracting officer did not violate any statute or regulation.

Truckla's arguments focus on the first and second factors, challenging the government's rationale for the termination and alleging bad faith. It contends that the contracting officer's stated rationale for the termination – that Truckla failed to complete the contract within the performance period – was arbitrary. No contractor, it contends, could have completed the work sooner than Truckla proposed to complete it, using PTM as subcontractor, in August 2011 (app. br. at 20, 31). Truckla contends that it was arbitrary for the contracting officer to require a guarantee that PTM would perform when she knew that PTM was willing (*id.* at 25-26). The result of the termination, according to Truckla, is that the government obtained the same work on the same schedule but at allegedly higher cost than the original contract price (with the overage passed on to Truckla) (*id.* at 16).

Truckla fails to carry its burden. The contemporaneous evidence contradicts nearly every Truckla assertion regarding its proposal to complete the work using PTM as subcontractor. Truckla asserts that it had "had an agreement ready with PTM" (finding 33; app. br. at 24). PTM stated at the time that it "does not have an agreement with Truckla" (findings 34, 38). What Truckla calls a subcontract agreement was an unsigned, marked-up draft (findings 27, 33). Truckla downplays the lack of signature, suggesting that the agreement was in place but for a signature (app. br. at 24, 26). At the time, however, PTM stated twice that no agreement existed and specifically identified material terms on which there was no agreement, such as price, work scope, liability, and payment terms (finding 38). Furthermore, PTM hedged on committing itself to a schedule. PTM initially suggested it might be available during a range between winter 2011 to summer 2011 (finding 34), then later suggested "late July or August 2011" or "as soon as river stages are workable after these dates" (finding 38).

Confronted with the lack of agreement on price or other material terms, PTM's repeated insistence that it had no agreement with Truckla, and its shifting, caveated schedule, the contracting officer was within her discretion to conclude that Truckla's plan to complete the work with PTM was not reasonably certain. It was not reasonably

certain to be completed on the schedule or at the price proposed by Truckla. The contracting officer did not require a "guarantee" as Truckla characterizes it (app. br. at 25-26), but rather reasonable certainty. Truckla failed to provide it.

Furthermore, Truckla asserts that its failure to complete the work within the contractual period of performance was a mere "technical" default and a pretext to get rid of Truckla. It asserts that the work was not urgent because the hardpoints were serving their intended purpose. (App. br. at 20-21, 27) Truckla analogizes to *Darwin Construction Co. v. United States*, 811 F.2d 593 (Fed. Cir. 1987) and its progeny (app. br. at 20-21).

The evidence refutes this theory. In *Darwin*, the Federal Circuit held that a default termination that was done "solely to rid the Navy of having to further deal with" the contractor was an abuse of discretion, in circumstances where the reason given for the termination was found to be a pretext, which the court called a "technical default." 811 F.2d at 595. In the *McDonnell Douglas* A-12 aircraft litigation, the Federal Circuit clarified *Darwin*, explaining that the technical default theory bars only a termination for default in which there is "no considered nexus between the default termination and the contractor's performance under the contract." Because in the A-12 termination, the government identified a nexus between the contractor's performance and the termination, the Court reversed a lower court decision overturning the termination. *McDonnell Douglas*, 182 F.3d at 1326.

Here, the contracting officer articulated a clear nexus between Truckla's performance and the default termination: Truckla did not complete the contract within the performance period (finding 35). Unlike in *Darwin*, where the contractor completed 65 percent of the work satisfactorily and the grounds for default were found to be pretextual, here Truckla satisfactorily placed only 13 percent of the stone and performed poorly (findings 20, 23). Unlike in *Darwin*, here, the government's justification was not a pretext. The contracting officer expressed reasonable and credible concerns that delay could exacerbate bank erosion because of the gaps and voids in the hardpoints left by Truckla's poor construction technique (findings 48, 50).

We also reject Truckla's allegations that the government acted in bad faith (app. reply at 10-13), which we interpret as an allegation that the government breached its duty of good faith and fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *SIA Construction, Inc.*, ASBCA No. 57693, 14-1 BCA ¶ 35,762 at 174,986, (citing *Metcalf Construction Co., v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014)). A breach of duty of good faith and fair dealing may be shown by proving, *inter alia*, a lack of diligence, willful or negligent interference, or failure to cooperate. *Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1988).

When the government is accused of breaching the duty of good faith and fair dealing, we examine the reasonableness of its actions, considering all of the

15

circumstances. *Free & Ben, Inc.*, ASBCA No. 56129, 09-1 BCA ¶ 34,127 at 168,742. Truckla infers bad faith from various government actions, such as its refusal to grant time extensions, all of which we found to be reasonable (finding 48). Accordingly, Truckla's argument to the contrary must fail.

Finally, we reject Truckla's contention that the contracting officer's consideration of the factors set forth in FAR 49.402-3(f), Procedure for Default (app. br. at 22-31), constitutes an abuse of discretion (*id.* at 22-28). This provision generally instructs contracting officers in how to carry out default terminations. Subsection 3(f) lists factors to be considered in determining whether to terminate a contract for default.[3]

---

[3] Subsection (f) provides:

> The contracting officer shall consider the following factors in determining whether to terminate a contract for default:
>
> (1) The terms of the contract and applicable laws and regulations.
>
> (2) The specific failure of the contractor and the excuses for the failure.
>
> (3) The availability of the supplies or services from other sources.
>
> (4) The urgency of the need for the supplies or services and the period of time required to obtain them from other sources, as compared with the time delivery could be obtained from the delinquent contractor
>
> (5) The degree of essentiality of the contractor in the Government acquisition program and the effect of a termination for default upon the contractor's capability as a supplier under other contracts.
>
> (6) The effect of a termination for default on the ability of the contractor to liquidate guaranteed loans, progress payments, or advance payments.
>
> (7) Any other pertinent facts and circumstances.

FAR 49.402-3(f).

It is well settled that this regulation does not confer rights on the defaulting contractor, *All-State Constr., Inc.* ASBCA No. 50586, 06-2 BCA ¶ 33,344 at 165,342, and failure to consider one or more of the factors does not require a default termination to be converted into a termination for convenience. *DCX, Inc. v. Perry*, 79 F.3d 132, 135 (Fed. Cir. 1996). Indeed, determination whether to terminate for default requires judgment and is a not mechanical box-checking exercise. The contracting officer's consideration of these factors is merely one element in evaluating whether there has been an abuse of discretion. *Michigan Joint Sealing, Inc.*, ASBCA No. 41477, 93-3 BCA ¶ 26,011 at 129,323-24.

Based on the review of the record, the contracting officer reasonably considered the relevant factors in FAR 49.402-3(f). She reviewed the applicable contract terms and law. She paid considerable attention to Truckla's specific failures and its excuses for failure. She considered the availability of services from other sources, the urgency of the services, and the time required to obtain them from other sources. She paid less attention to the degree of Truckla's essentiality to the government or the effect of a termination on Truckla's ability to liquidate guaranteed loans, progress payments, or advance payments. (Finding 48) Overall, we hold that the contracting officer's consideration of these factors sufficient in the circumstances of this appeal despite Truckla's assertions to the contrary.

B.    The BP Oil Spill Did Not Cause Truckla's Delay

Truckla contends that its failure to complete the work on time was the result of the BP oil spill, which Truckla contends was an excusable delay. Truckla contends that the BP oil spill caused an acute shortage of spud barges when river stages would have permitted work, and Truckla could not locate spud barges in time to complete the contract. (App. br. at 34-36)

The government does not dispute that the BP oil spill complicated Truckla's efforts to locate spud barges. It argues rather that Truckla was at fault because it failed to secure spud barges with long-term leases, and because it failed to pay a supplier, impairing Truckla's ability to secure other suppliers and subcontractors who had access to spud barges. The government notes that other contractors on Corps water projects during the same period did not report problems locating spud barges. (Gov't br. at 12-14; finding 48)

We have carefully examined the evidence regarding Truckla's difficulty locating spud barges. While demand for spud barges intensified during summer and fall 2010 (finding 28), Truckla has not carried its burden to prove that the BP oil spill was an excusable delay under the default clause, for two reasons.[4] First, Truckla located at least

--------

[4] We do not attribute fault or negligence to Truckla arising from its failure to

two subcontractors to perform the remaining work, PTM and Upper Missouri River Corporation (findings 27, 29). However limited the availability of spud barges, that limitation did not cause Truckla's delay, because Truckla found other potential subcontractors to complete the work. Each potential subcontractor did not complete the work within the performance period for reasons apart from the BP oil spill. PTM was unavailable during the performance period at times coinciding with favorable river stages (findings 27, 34, 38), and Upper Missouri declined the job because Truckla's rock supplier cut off Truckla's supplies for nonpayment (finding 29).

Second, Truckla's fault or negligence contributed to its inability to secure spud barges or a subcontractor with access to them. Its failure to pay the rock supplier led that supplier to refuse to supply Truckla with rocks or barges, which caused Upper Missouri to decline the job (finding 29). Further supporting the inference that Truckla was at fault is that the contracting officer knew of no other Corps contractors who had problems locating spud barges on Corps projects during this period (finding 48).

Truckla blames the government for its inability to pay the rock supplier, because the government did not pay the full amount of its invoice for progress payments (app. reply at 10). This contention is without merit. Truckla was responsible to provide sufficient financial resources for the performance of the contract; its financial incapacity is not a legitimate excuse for its failure to perform. *See Danzig v. AEC Corp.*, 224 F.3d 1333, 1339 (Fed. Cir. 2000); *TGC Contracting Corp. v. United States,* 736 F.2d 1512, 1515 (Fed. Cir. 1984); *Cosmic Constr. Co.*, ASBCA Nos. 24014, 24036, 88-2 BCA ¶ 20,623.

In some instances a government failure to satisfy a payment obligation can excuse nonperformance if the nonpayment was a controlling cause of the contractor's failure to perform, *e.g., Cosmic Constr.,* 88-2 BCA ¶ 20,623 at 104,242. That is not the case here, first, because the government had no obligation to pay more progress payments than it paid. The contract entitled Truckla only to progress payments based on estimates of work accomplished "*which meets the standards of quality established under the contract.*" FAR 52.232-5, PAYMENTS UNDER FIXED-PRICE CONSTRUCTION CONTRACTS (SEP 2002) (emphasis added) (finding 8). The hardpoints did not meet the contractual quality standards (findings 20-21, 23-24). The government nevertheless made a partial progress payment based on its estimate of accomplished work that, although nonconforming, could readily be corrected, and stated that no additional payments would be made until Truckla made the corrections (finding 23). Truckla never made the corrections, even when river stages were favorable (finding 25). Had it performed the corrections requested by the government when it had the opportunity, Truckla could have qualified for additional progress payments. Furthermore, Truckla

---

secure spud barges through a long-term lease, as the contract performance period was only 60 days and Truckla did not previously have trouble renting spud barges on short notice (findings 9, 28).

18

made no showing that the government's nonpayment was a controlling cause of its failure to pay the rock supplier (finding 30).

## C. The Government Did Not Breach the Contract

Finally, Truckla contends that the government breached the contract by failing to provide control points at Island 86 which, it asserts, caused Truckla to build the hardpoints in the wrong locations (app. br. at 38-39). The contract required the government to provide 2 control points at Island 86, which Truckla was required to use to identify the locations for all the hardpoints and determine all other measurements (finding 52). The government provided at least 2 control points, if not more, at Island 86. Truckla failed to locate these control points because it did not search for them, as its employee conceded. (Finding 53) Because the government provided the control points that it was required to provide, there was no breach.

Truckla contends that it was "advised" by a Corps quality control employee that the hardpoint locations could be identified with a GPS device rather than by searching for the control points, a suggestion to which Truckla says it "acquiesced" (app. br. at 8, 38-39). The testimony cited by Truckla does not support the assertion that a Corps employee so advised Truckla (finding 54). Moreover, such advice, had it been given, would not have modified Truckla's contractual responsibility to lay out the work "from the base lines and bench marks established by the government" (finding 52); *see also* FAR 52.236-17, LAYOUT OF WORK (APR 1984).

Truckla also contends the government breached the contract by refusing to pay for surveys and bond costs incurred by Truckla (app. br. at 39). There is no merit in these contentions. These items were not separately priced, and the contract provided that items not separately priced were to be compensated from the lump sum payments for stone placement (findings 6-7). Accordingly, Truckla was not entitled to additional payment for either surveys or bond costs. *R.L. Bates General Contractor Paving & Assocs.*, ASBCA No. 53641, 10-1 BCA ¶ 34,328 at 156,550; *Bean Stuyvesant, LLC*, ASBCA No. 52889, 01-1 BCA ¶ 31,224 at 154,117.

We hold that the contracting officer did not abuse her discretion in determining to terminate for default; the BP oil spill was not an excusable delay; and the government did not materially breach the contract. The appeal challenging the default termination is denied.

## II. ASBCA No. 57752: Truckla's Claim for Additional Payment

Truckla appeals from the contracting officer's final decision denying its claim for additional payment for stone, performance bond costs, and surveys, for which Truckla contends it was not fully paid.

A construction contractor who has been properly terminated for default is entitled to payment for work that was properly performed in accordance with the contract prior to the default termination. *See J.G. Enterprises, Inc.*, ASBCA No. 27150, 83-2 BCA ¶ 16,808 at 85,543; *Ventilation Cleaning Engineers, Inc.*, ASBCA No. 18580, 74-2 BCA ¶ 10,873 at 51,754-55. Truckla bears the burden to prove that it performed work for which it was entitled to be paid. *See M.A. Mortenson Co.*, ASBCA No. 53105 *et al.*, 04-2 BCA ¶ 32,713 at 161,845.

As noted above, Truckla is not entitled to separate payment for its performance bond or survey costs because the contract provided that compensation for both of these items was included in the payment for stone. *See* Section I.A. Accordingly, the merits of this claim turn on whether Truckla was fully paid for the stone that it laid.

Truckla contends that it placed 22,781 tons of stone and was only paid for 9,465, thus it claims it was not paid for 13,316 tons of stone. Truckla claims entitlement to an additional $349,944.48 for placed stone (app. br. at 40-42). The contract provided that Truckla was to be paid "for stone satisfactorily placed" (finding 4). While Truckla asserts that it is "undisputed" that all 22,781 tons of stone that it placed was "actually used for the hardpoints" (app. br. at 40), it cites no evidence to support this contention. The record evidence contradicts it. Truckla concedes that the hardpoints did not conform to the contract requirements, thus some stone placed on the hardpoints was not "satisfactorily placed" (findings 20, 24). Truckla mislaid additional stone during its operations. PTM attempted to recover the mislaid stone but was unable to locate or recover all of it. (Finding 44) Thus, Truckla has not shown that it, instead of PTM, satisfactorily placed stone for which it was not paid.

PTM recovered some of the mislaid stone and placed it into the hardpoints (finding 44). The Takeover Agreement contained an estimate of 7,326 tons of stone placed for which Truckla had not been paid (finding 42). In accordance with Truckla's performance bond, the government paid the surety for this stone (findings 41-42). Truckla does not argue that the government improperly paid the surety rather than Truckla.

Finally, Truckla sought damages in an amount to be determined for reputational harm and loss of future business (finding 56). Truckla did not address this aspect of its claim in its post-hearing brief.[5] Accordingly we deem this aspect of its claim to have been abandoned. *See States Roofing Corp.*, ASBCA No. 54860 *et al.*, 10-1 BCA ¶ 34,356 at 169,664 (failure to address contention in post-hearing brief equated to abandonment of the issue).

---

[5] Since this claim has been abandoned, we need not address whether it sought a sum certain and thus whether we ever had jurisdiction over it. *See* FAR 2.101.

20

## CONCLUSION

The appeal in ASBCA No. 57564 is denied and the default termination is sustained. Truckla's claim for additional payment in ASBCA No. 57752 is also denied.

Dated: 26 January 2017

ELIZABETH W. NEWSOM
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

21

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 57564, 57752, Appeals of Truckla Services, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals
